UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DERON DARNELL LOVE,

        Plaintiff,

        v.                                   Case No. 12-C-0010

LT. WILLIAM BROWN, JONI SHANNON-SHARPE,
DR. STACEY HOEM, PETER A. HUIBREGTSE,
SECURITY DIRECTOR L.J. SCHWANDT,
CAPT. LARRY PRIMMER, LT. TODD BRUDOS,
THOMAS BELZ, OFC. KEITH WEIGEL,
SGT. MARK CARPENTER, and
CAPTAIN LEBBEUS BROWN,

        Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 80)

Now before the court is defendants' motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

BACKGROUND

The plaintiff, Deron Darnell Love, was a state prisoner housed at the Wisconsin Secure Program Facility (WSPF) from approximately February 2, 2010, to October 21, 2010. Plaintiff was housed in Alpha Unit, on segregation status, the entire time he as housed at WSPF. He is proceeding against eleven defendants in their individual and official capacities on claims that his conditions of confinement at WSPF violated his Eighth Amendment rights because he was denied adequate clothing, shelter, food, and personal safety.

A mental health screening was performed on plaintiff on January 13, 2010, prior to his transfer to WSPF. There was no contraindication for plaintiff to be transferred to WSPF.

On February 2, 2010, plaintiff underwent a mental health screening by members of WSPF's Psychological Services Unit (PSU) and Health Services Unit (HSU). During the assessment, defendant Joni Shannon-Sharpe classified plaintiff as MH-1, indicating that he

had a mental health need that was not a serious mental issue. The common diagnoses in this category include adjustment disorder, mild to moderate depression, anxiety, or PTSP, ADHD, impulse control disorder, or mild to moderate personality disorder. Plaintiff reported that he was bipolar, but such a diagnosis was not reflected in his psychological records.

On February 11, 2010, defendant Dr. Stacey Hoem filed plaintiff's Psychological Services Intake form. She noted that plaintiff had a history of "malingering psychotic symptoms." Declaration of Brian C. Spahn, ¶ 37, Ex. 36, ECF No. 112, 114. Dr. Hoem also noted a history of drug seeking, including Seroquel, a medication used to treat bipolar disorder. Additionally, she coded plaintiff as MH-1 and considered his suicide risk low. Plaintiff's relevant diagnostic history reflected adjustment disorder unspecified and anti-social personality disorder.

Clinical observation is a non-punitive status used for the temporary confinement of an inmate to ensure the safety of the inmate or the safety of others. An inmate may be placed in clinical observation for mental illness and dangerousness to self or others. This status is used when an inmate displays a substantial risk of self-harm or self-destructive behavior, not when the inmate presents an imminent risk of suicide. The primary function of clinical observation is to ensure an inmate's safety. When an inmate is placed in clinical observation status and on close observation, he is monitored every fifteen minutes by staff in the unit. An inmate at high risk for imminent suicidal behavior shall be placed on constant observation. Constant observation includes continuous line of sight monitoring by correctional officers whose task is dedicated to the monitoring. Mechanical restraint may be required while an inmate is on clinical observation status. Once an inmate is placed in

clinical observation, he is assessed by clinical staff every working day. This assessment is done at cell front.

Prior to placing an inmate into clinical observation, the following things are considered: the inmate's self-report and presentation on that day, history of self-harm threats and/or behavior, level of agitation, risk of harm if the inmate is in a regular cell with property versus a clinical observation cell with limited property, coping skills and prior use of coping skills if the inmate was in a similar status, working relationship with PSU and interactional history with all staff.

Dr. Hoem testified that she assesses multiple things, such as an inmate's current emotional state, level of agitation, level of cooperation with PSU assessment, whether the inmate is future oriented, what the inmate reports regarding thoughts of self-harm, the triggers and catalysts that led to this state, and the inmate's coping strategies prior to release from clinical observation. Hoem reviews the observation logs, speaks with unit staff, and incorporates that information into the assessment of the inmate to determine if the inmate can be released from clinical observation.

This placement and retention in observation status involves medical decisions and it is up to medical personnel to decide how long to keep the inmate in observation and what clothing and other property he is allowed to have in his cell. During 2010, there were no guidelines regarding the possession of personal property during clinical observation. The property that may be given to an inmate rests on the discretion of clinical staff and the PSU supervisor's directives. The decision is based on the nature of the inmate's self-harm threat or gesture, the inmate's agitation level, and risk to the inmate that the property may present. In 2010, clothing was generally not given to an inmate in clinical observation status because

of the possibility the inmate may quickly turn the property into objects of self-harm and use the items accordingly. Dr. Scott Rubin-Asch, the supervisor at the time, stated that PSU staff were instructed to not authorize a segregation smock initially if the inmate had attempted or threatened to hang himself, or if the inmate had a history of hanging attempts. Hoem recalls that plaintiff frequently used his clothing and bedding to threaten self-harm and engaged in behaviors intended to harm himself using clothing and bedding, such as fashioning a noose for hanging.

A segregation smock is a tear-resistant single-piece outer garment that is generally used to protect an inmate from forming a noose with the garment to commit suicide. Typically, the smock is a simple, sturdily quilted, collarless, sleeveless gown with adjustable openings at the shoulders and down the front that are closed with nylon fasteners. The thickness of the garment makes it difficult to roll or fold the garment so it can be used as a noose. It is not a restraint and provides modesty and warmth while not impeding the mobility of the inmate.

Segregation smocks can be used to engage in self-harm, even in clinical observation status. However, it is not impossible for an inmate to make a noose out of a segregation smock. Inmates may rip a segregation smock into pieces to make a noose. Dr. Hoem was aware of this occurring at WSPF. Even though segregation smocks are designed to be tear-resistant, inmates have torn them and have used them for self-harming gestures and behaviors.

Moreover, an inmate could use a segregation smock for self-harm in ways other than fashioning a noose. An inmate could suffocate himself by ripping the smock, tying the fabric into knots, and swallowing the fabric until suffocation. An inmate at another institution had

5

such an incident. Also, an inmate could hide beneath a segregation smock and engage in acts of self-harm such as cutting or swallowing hidden pills. Dr. Hoem averred: "I always keep these incidents of self-harm with a segregation smock in the back of my mind while assessing a situation of placing an inmate in clinical observation status." Supplemental Affidavit of Stacey Hoem, ¶ 66, ECF No. 121. On occasion, security staff makes a decision to place an inmate in control status because of his violent and/or disruptive behavior and staff may decide not to give him clothing, a segregation smock, or bedding.

According to plaintiff, at some time in April or May 2010, Lt. William Brown took his mattress, sheets, and blankets for two weeks, and he was forced to sleep on cold concrete for fourteen days. Plaintiff believes there was a restriction form regarding this incident, but defendants have not produced it. Lt. Brown concedes that he could have been involved in this incident, but he does not recall the specifics and therefore does not offer any justification or explanation for why the bedding was taken. When asked if he was involved in taking plaintiff's bedding, Lt. Brown says:

> I very well could have been. I don't recall any specifics. Again if I could review incident reports I'd know, but I don't recall off the top of my head a specific day where I took a mattress or sheets from him. If I had to guess, I would say yeah.

Declaration of Brian C. Spahn, Ex. 55 at 8, ECF No. 115-1.

On March 17-18, 2010, plaintiff was placed in clinical observation for the first time. He was left in the observation cell with a security mattress and a segregation smock for approximately 21 hours. Prior to that, on May 16, 2010, at 12:07 p.m. Captain Sara Mason notified Shannon-Sharpe via telephone that plaintiff had tied a sheet around his neck. Shannon-Sharpe authorized plaintiff's placement in clinical observation status because he

was engaging in self-harming behaviors, making suicidal gestures and was unable to contract for his safety. Plaintiff says that he tied the sheet around his neck out of frustration in an attempt to speak with a captain and that he was not attempting to harm himself and knew it was impossible to hang himself. He was placed naked in clinical observation at 12:07 p.m. and was given a segregation smock at 4:18 a.m. on May 17, 2010, approximately 16 hours later. Dr. Gurpeet Paul released plaintiff from clinical observation at 10:30 a.m. on May 17, 2010, and plaintiff was then placed in controlled segregation.

On June 16, 2010, at 11:30, Dr. Becker-Lindow placed plaintiff in clinical observation naked. A segregation smock was added at 2:35 p.m. Shannon-Sharpe did a follow up assessment on June 17, 2010, at 10:38 a.m. She concluded that he needed further monitoring after making the following evaluation:

> Mr. Love was screaming, yelling and kicking his door when I approached his cell front. Security staff reported that he had attempted to rush the trap on one of the officers on third shift and that he later held his tray. Inmate has been kicking his cell door intermittently throughout the morning. Inmate was agitated and yelling when I was speaking with him and continuously asked to see a white shirt. Inmate did not give a commitment to his safety.

Affidavit of Ellen K. Ray, Exhibit 1001 at 15, ECF No. 95-2.[1]

> Dr. Hoem also did a follow-up assessment on June 17, 2010 at 3:45 p.m., and noted:

> Mr. Love was yelling down the hall demanding to speak with PSU staff. He stated that the CIW [crisis intervention worker] "promised" to let him out of obs. and that he had been good. I read a few comments written by staff regarding unstable behavior (i.e. kicking door) and that he was told by CIW he would not be released if agitated. He got upset and called me a "fat bitch."

---

[1] Attached to the Affidavit of Ellen K. Ray are Exhibits 1000 and 1001, which both contain relevant documents from plaintiff's WSPF HSU and PSU records, including a number of DOC-27 Placement/Review of Offender in Observation forms.

Affidavit of Ellen K. Ray, Exhibit 1000 at 3, ECF No. 95-1. Dr. Hoem continued plaintiff in clinical observation that day because "[i]nmate was continuing to exhibit unstable behavior and agitation he will remain in obs. To ensure his safety (and others)." *Id.* She also did a follow up assessment of plaintiff on June 18, 2010, and released him from clinical observation at 10:30 a.m. because he denied any suicidal ideation and his behavior was stable. There had been no signs of agitation for the last few hours.

On June 29, 2010, plaintiff informed security staff that he was going to swallow some pills. Plaintiff held up a cupped hand with what appeared to be medication and gestured as though he was swallowing what was in his hand. The security staff did not know if plaintiff had medication in his hand and, if so, the amount or kind he had. When Shannon-Sharpe arrived at plaintiff's cell, he "was lying on his floor, face down, with a sheet covering his entire body. Movement and breathing was observed, however Inmate would not comply or respond." Exhibit 1001 at 18. After numerous attempts to gain plaintiff's compliance and several minutes of plaintiff lying on the floor, he finally stood up and complied with staff in order to be restrained and taken to the HSU for further assessment. Plaintiff continued to be non-compliant in the HSU. It was ultimately determined that plaintiff would be monitored in a clinical observation cell at WSPF instead of being taken to the hospital because it was unlikely that he had the opportunity to procure medication.

As a result of this incident, Shannon-Sharpe placed plaintiff in clinical observation naked at 5:25 p.m., even though plaintiff appeared "to be manipulating and gesturing for secondary gain of some sort." Exhibit 1001 at 18.

> Upon placement in the clinical observation cell, Inmate Love once again began acting out. He yelled out to another Inmate, "Shannon-Sharpe is going to be sued by me in a lawsuit an[d] she is once again placing me in

observation with no seg smock." He then began kicking on his door and yelling and screaming. When I approached his cell, he stood on his bench with his penis in his hand and began masturbating in front of me. Inmate did not appear in any distress at this time, nor did he present as though he had taken any overdose of medication. He was agitated and acting out inappropriately due to his anger. He was no longer complaining of or presenting as though he was in any pain from medication ingestion. Inmate was alert and oriented at this time. No significant markers of any serious mental health or physical problems.

*Id.* Plaintiff was provided a segregation smock on June 30, 2010, after appearing future oriented.

Shannon-Sharpe evaluated plaintiff at 11:46 a.m. on June 30, 2010. Plaintiff admitted that he never took a large amount of medication and that he was trying to get the attention of the unit manager. She considered him appropriate for release from clinical observation. Moreover, she noted that plaintiff said, "Shannon-Sharpe, I have told you before that I would never hurt myself because I love myself, so you know I'm not going to do anything to myself." Exhibit 1001 at 22.

On July 1, 2010, at 12:40 p.m., Dr. Becker-Lindow put plaintiff on clinical observation completely naked; he received only a security mattress. She noted that plaintiff's behavior this week has continued to escalate and that he had already made threats of self-harm and suicidal gestures and continued to make verbal threats of self-harm that are taken very seriously. She also mentioned his placement in clinical observation status earlier that week for reporting that he took pills in an attempt to harm himself. Dr. Hoem observed plaintiff two hours later and released him from clinical observation because he was much calmer and laughing and joking while speaking to other inmates; he also denied any thoughts of self-harm.

On July 19, 2010, defendants Officer Thomas Belz and Officer Keith Weigel handcuffed plaintiff, put leg restraints on him and escorted him to the HSU for a 10:30 a.m. doctor's appointment. When they arrived, plaintiff said he did not want to see the doctor and that he just wanted to see a white shirt (a supervisor). Belz and Weigel took plaintiff back to his cell and removed his handcuffs. They forgot to remove the leg restraints; the restraints were not removed until about 2:00 p.m., when the shift changed. Defendants suggest that plaintiff did not alert anyone about the restraints until after the shift change at 2:00 p.m., but plaintiff says he contacted Sergeant Carpenter via the intercom earlier than that. Regardless, plaintiff was left in his cell wearing leg restraints for approximately three and a half hours. At all times during this incident, plaintiff was visible through his cell windows and door trap. After plaintiff filed a complaint regarding the leg restraints, Officers Weigel and Belz were reprimanded by Warden Huibregtse for their negligence.

On August 10, 2010, Shannon-Sharpe authorized Captain Primmer to place plaintiff in clinical observation at approximately 5:00 p.m. Plaintiff asked to go to clinical observation to think about his situation and then later remarked that he was going to kill himself. Related records indicate: "[i]nmate appears to be manipulating in order to make a statement, however due to his adamant remarks that he be placed in obs and that if not he will kill himself, Inmate Love was placed in observation status to ensure his safety while being closely monitored." Exhibit 1001 at 25. Plaintiff said he would go to the observation cell compliantly, but once he was placed in the strip cell he refused to come out and security staff had to use chemical agents to get him out of the strip cell and into the observation cell. After the extraction from the strip cell, Captain Primmer told plaintiff that he would not be given a towel, and he was escorted down the Alpha Unit hallway completely naked. The

walk down the hallway took seventeen seconds. Plaintiff was placed in cell 404 Alpha Unit without any clothing.

The next day, Shannon-Sharpe released plaintiff from clinical observation at 10:00 a.m. because he was denying suicidal ideation and was future oriented. Plaintiff "stated that he was upset over numerous issues yesterday but reports that he would never kill himself and has no intentions of doing so. Inmate reported that he also gets bored in here and this helps his time go faster." Exhibit 1001 at 24. He was moved to controlled segregation.

While plaintiff was on control status, on August 13, 2010, he threatened to kill himself. Dr. Hoem attempted to speak with him, but he was lying on the floor and refused to respond. Plaintiff complained of a bloody nose, but Dr. Hoem could observe no injuries. He then threw himself against the cell door and claimed to have hurt his head even though his hands and arms were up and his head was well protected. Plaintiff briefly feigned the inability to walk.

Dr. Hoem placed plaintiff in bed restraints at 1:05 p.m. because he "threatened to kill himself and at least gave the appearance of harming himself." Exhibit 1001 at 28. Although Dr. Hoem's placement of plaintiff in bed restraints said no clothing, the video of plaintiff's removal from bed restraints shows he was wearing underwear.

At 3:45 p.m. on August 13, Dr. Rubin Ash released plaintiff from the bed restraints and placed him into clinical observation status.

> It was determined that Mr. Love required monitoring after having restraints removed. He stated that he would not harm himself. However, it was determined that he required placement in clinical observation status in order to place him in a safe environment where the chances of self-harmful behavior would be less than they would be if returned to his cell or control status.

Exhibit 1001 at 29. The form indicates that he was allowed a segregation smock at that time.

Dr. Becker-Lindow released plaintiff from clinical observation status at 4:20 p.m. on August 16, 2010, because he contracted for his safety and denied any thoughts of self-harm. However, "[a]fter inmate was released from clinical observation today he called to Sgt. Hoffman stating he wanted to harm himself and to be placed back into clinical observation." Exhibit 1001 at 31. Dr. Becker-Lindow met with plaintiff at his cell front.

> He was angry and yelling about his restrictions. Specifically, he was upset about "back of cell restriction, paper restriction, and being on nutra loaf for the next five days." Mr. Love complained that security was trying to starve him. He reported that he might as well be in clinical observation if he has all of these restrictions. He stated, "I want to kill myself. Put me in obs Becker." He indicated that he did not know how he would harm himself; however, he reported that he would not hang himself. He requested that he be given a seg. smock. He also requested that he be "strapped down." Informed him that I could not place him into restraints based on his request. He indicated that he would "bust [his] head open like [he] did on Friday."

Exhibit 1001 at 31. Dr. Becker-Lindow returned plaintiff to clinical observation, with a segregation smock, at 7:10 p.m.

Dr. Becker-Lindow evaluated plaintiff on August 17 and continued his placement in clinical observation to ensure his safety. "Since he refused to participate in the assessment process, he continues to be at risk for self-harm." Exhibit 1001 at 32.

Shannon-Sharpe conducted the follow-up reviews on August 18 and August 19 and ultimately released plaintiff from clinical observation on August 19, 2010, at 4:38 p.m. On August 18, plaintiff became agitated and angry, covered his camera and windows, and was non-compliant with security staff. At 9:00 a.m. on August 19, plaintiff continued reporting that he needed to be in clinical observation and that he would not stop acting out in ways

that may put him at risk for self-harm. After a lengthy discussion in which plaintiff changed his mind several times about staying on observation status, Shannon-Sharpe concluded that plaintiff "[i]s appearing in a manipulative manner and indicates that he is bored an[d] planning on acting out until he is released from prison in several months." Exhibit 1001 at 34. Shannon-Sharpe recommended plaintiff's release from clinical observation later that day because plaintiff was stable, denied suicidal ideation and reported that he had no intention of doing anything disruptive until at least Saturday because he wants to take a shower and send cards to his brothers.

By phone on August 27, 2010, at 4:30 a.m., Shannon-Sharpe directed that plaintiff be placed on clinical observation status after he told staff that he was going to kill himself; she authorized a segregation smock. Dr. Hoem released plaintiff from clinical observation status at 9:30 a.m. that morning after he denied any thoughts of self-harm and appeared calm and rational. Plaintiff also admitted his fault in the interaction and said that he would just comply with staff directives the next time. He was then placed in controlled segregation for approximately one day. Later that day, plaintiff submitted a complaint to the ICE asserting that he was denied water for four days at the direction of Captain Brown. The complaint was dismissed.

Shannon-Sharpe placed plaintiff in clinical observation status naked at 10:20 a.m. on September 9, 2010, after he took his sheet, tied one end of it to the shower head and wrapped the other end around his neck. When plaintiff finally complied with directives to come to the front of the cell, he was agitated and angry regarding security issues. He made repeated statements that he needed to be placed in observation status. Plaintiff was hitting

the door with his fist because he was angry about not being promoted to the next step.

Shannon-Sharpe wrote:

> Inmate continues to make threats and gestures of self-harm and reports a need to be placed in clinical observation status. Inmate vacillates back and forth stating he's going to harm himself and then later that he won't harm himself. Due to repeated threats and gestures, Inmate was placed in clinical observation to ensure his safety in a safe, controlled environment.

Exhibit 1000 at 13. Dr. Hoem released plaintiff from clinical observation at 9:30 a.m. the next day when he was calm and denied thoughts of self-harm.

On September 15, 2010, at 10:50 a.m., Dr. Hoem placed plaintiff into clinical observation status.

> Mr. Love was upset about an extension of his paper/property restriction. He stated that he wanted to kill himself and planned to "make us" send him to the hospital. He later threatened to overdose on pills he claims to have hid in his cell.

Exhibit 1000 at 15. Plaintiff refused to comply with his escort to clinical observation and told Captain Brown to "suit up." Plaintiff grabbed approximately 12 pills and swallowed them on two different occasions. He then grabbed a bottle of vitamins and swallowed about 20 of them while resisting attempts to be restrained by staff. Chemical agents were used in an attempt to stop plaintiff from ingesting pills. Dr. Hoem concluded, "Due to Mr. Love's ingestion of unknown pills, he was taken to the hospital. He was placed in clinical observation due to the seriousness of his behavior and threats of self-harm." *Id.*

On September 16, 2010, at approximately 3:10 a.m., plaintiff was left naked in a strip cell on Alpha Unit by a WSPF cell extraction team that included Captain Primmer, Officer Dunbar, Officer Morris, Officer Waters, and team leader Officer Sherman. After plaintiff was removed from his cell, walked to the strip cell wearing a segregation smock and spit mask,

and placed into a strip cell, Captain Primmer told plaintiff that he was losing the segregation smock. When plaintiff asked that the segregation smock be returned, Captain Primmer told plaintiff that he would not get his smock back until the morning. Plaintiff was left naked in the strip cell.

Dr. Hoem did a follow up review later on September 16, 2010, and released plaintiff from clinical observation status at 2:10 p.m. that day. At that time, he was smiling and laughing and denied any suicidal ideation.

On September 22, 2010, plaintiff told several staff members that he wanted to kill himself. Although he was agitated, he did not report or appear to be suffering from any psychotic symptoms. "Mr. Love reported later to staff that he was not truly suicidal and instead made threats in an attempt to manipulate PSU staff into immediately responding to his unidentified concerns." Exhibit 1000 at 17. Dr. Becker-Lindow placed plaintiff into clinical observation naked at 3:00 p.m. and wrote:

> Inmate was placed into clinical observation as he continues to make threats of self-harm. Given his past history of suicidal gestures and threats, PSU continues to take his potential threats of self-harm serious by placing him into clinical observation to ensure his safety. Mr. Love is well aware that if he makes suicidal statements, PSU will have to place him into clinical observation for his own safety, even if he later recants these statements. He will be seen tomorrow by available PSU staff to reevaluate his appropriateness for continue placement in clinical observation status.

*Id.* A cell extraction team supervised by Captain Lebbeus Brown removed plaintiff from his cell and walked him to clinical observation cell 404 Alpha Unit on September 22, 2010. While outside cell 404, the cell extraction team cut off plaintiff's clothing and placed him in the cell naked. At no time on September 22, 2010, was plaintiff offered or provided clothing

or a segregation smock after being placed in the clinical observation cell. From September 22, 2010, through September 27, 2010, plaintiff was left naked in his cell.

Dr. Hoem did a follow up review on September 23, 2010, and continued plaintiff's placement due to his level of instability and constant threats of self-harm. Later that day, plaintiff covered his camera and appeared to need another cell extraction. On September 24, 2010, Dr. Hoem conducted follow-up review. Plaintiff was "argumentative and easily agitated." Exhibit 1000 at 19. Dr. Hoem found, "Mr. Love has demonstrated unstable behavior and frequently makes threats of self-harm in order to force staff to perform a cell extraction. Additional time of stable behavior will be required before he is released." *Id.*

Plaintiff was finally released from clinical observation at 10:00 a.m. on September 27, 2010, by Shannon-Sharpe. Her evaluation states:

> Inmate Love was seen at cell front for assessment. He was appropriate with this writer, and staff have noted he has been appropriate most recently. He stated that he has no suicidal thoughts and wants to go back to his regular cell so he can take a shower and rest a bit. Inquired about his unstable behaviors, threats and suicidal gestures through the past several weeks and what we can do to maintain his safety. Inmate stated that he is going to go home in January and that he has every intention of acting out intermittently until he is released, as he has nothing in his cell to occupy his time. He does report, however, at this time he has no thoughts of causing any trouble and/or of making any threats or gestures of self-harm and plans on "laying low" for awhile.

Exhibit 1001 at 44.

By 2:00 p.m., though, plaintiff reported to Officer Gallinger that he was having thoughts of harming himself. When Shannon-Sharpe arrived at plaintiff's cell, he was lying on his floor talking in his vent with another inmate. Shannon-Sharpe asked plaintiff what his concerns were, but he just looked at her and said, "Put me in clinical obs." Exhibit 1001 at 45. Shannon-Sharpe asked plaintiff what he planned to do, and he said, "Don't worry

16

about it." *Id.* She attempted to elicit further response, but he refused to speak to her any more. Shannon-Sharpe placed plaintiff in clinical observation due to his repeated and ongoing threats of self-harm. Plaintiff "advised numerous times that his threats must be taken seriously and that PSU doesn't know if he actually intends on carrying out his threats or not." *Id.* Despite his request to go to observation, a cell extraction team was assembled to move plaintiff from his cell. He was highly agitated and acting aggressively towards staff. Plaintiff was naked for this placement.

Shannon-Sharpe continued plaintiff's placement (naked) in clinical observation on September 28, 2010. Overnight he had shown the third shift nurse what appeared to be five pieces of rolled up toilet paper in his hand; he wanted her to believe it was medication he was going to ingest. When Shannon-Sharpe approached plaintiff's door, he yelled obscenities at her, claimed he never said anything about killing himself, and accused her of lying.

On September 29, 2010, at 2:00 p.m., Dr. Hoem did a follow up review of plaintiff's clinical observation placement; he remained in clinical observation status. She found: "Mr. Love continues to show very poor decision-making and instability with regard to constant threats to harm himself making nooses in his cell, and threatening to take pills. He will remain in obs. to ensure a longer period of stability before release back to his regular cell." Exhibit 1000 at 20.

Shannon-Sharpe released plaintiff from clinical observation on September 30, 2010, at 11:35 a.m., after he was calm, polite, and appropriate, and said he wants to come out of observation status and has no thoughts of hurting himself.

On October 6, 2010, plaintiff was walked down the hallway naked at WSPF by a cell extraction team from the strip cell to cell 404 Alpha Unit to be placed in control status. This walk lasted twenty seconds. Plaintiff was placed in cell 404 without any clothing. At no time was plaintiff provided or offered clothing or a towel to cover his private parts. On October 7, 2010, it was determined that plaintiff was no longer appropriate for placement at WSPF.

Staff considered plaintiff to be manipulative. Plaintiff received a significant amount of attention from prison staff at meetings. Defendant Schwandt would often bring up issues regarding plaintiff to defendant Huibregtse during morning executive staff meetings. Warden Huibregtse testified that plaintiff "garner[ed] a lot of attention from a lot of [WSPF staff]" . . . and was somebody who we were all pretty much aware of in terms of being a difficult person to deal with, very manipulative." Declaration of Brian C. Spahn, ¶ 3, Exhibit 2 at 106:21-107:1, ECF No. 112-2. Several defendants describe plaintiff as a problematic inmate.

Plaintiff wrote to Huibregtse and Schwandt on a number of occasions. On September 22, 2010, Schwandt responded to plaintiff's correspondence to Huibregtse with a memorandum reviewing plaintiff's paper restriction, his behavioral log notations, and his pending conduct reports. She wrote: "I strongly encourage you to pursue your legal endeavors, rather than choosing the recent behavior you have chosen." Declaration of Brian C. Spahn, ¶ 4, Exhibit 3 at 14, ECF No. 112-3.

Plaintiff was placed on Nutraloaf restriction two or three times while he was housed at WSPF, for a total of nine to twelve days. He also filed three inmate complaints stating that he was being denied meals. Neither party proposes additional findings of fact regarding Nutraloaf or missed meals.

18

Plaintiff avers that he lost approximately 45 pounds during the eight months he was at WSPF and attributes his weight loss to being denied meals on numerous occasions. At his deposition plaintiff testified:

> I was on Nutraloaf maybe two or three times, maybe. That wasn't even - - even on the days I didn't eat the Nutraloaf or the days I did, it still wouldn't amount to nowhere nears all the weight I lost. I was only on Nutraloaf two or three times the whole eight, nine months I was at Boscobel.

Declaration of Brian C. Spahn, ¶ 2, Exhibit 1 at 43:7-12, ECF No. 112-1.

Dr. Burton Cox submitted an affidavit in support of defendants' motion for summary judgment acknowledging plaintiff's weight loss between February 2, 2010, and October 21, 2010, but stating that he had "no reason to be medically concerned about [plaintiff's weight loss] because Love's weight remained about the ideal range for his height, which was 5'7"." Affidavit of Burton Cox, Jr., D.O., ¶ 14, ECF No. 87.

## DISCUSSION

The Eighth Amendment prohibits cruel and unusual punishment and applies to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962); *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006). To succeed on a conditions of confinement claim under the Eighth Amendment, plaintiff must show that the conditions of his confinement denied him "the minimal civilized measure of life's necessities." *Gillis*, 468 F.3d at 491. "[L]ife's necessities include shelter, heat, hygiene items and clothing." *Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014). Plaintiff must also show that defendants acted with a culpable state of mind:

> [A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it.

*Farmer v. Brennan*, 511 U.S. 825, 847 (1994)).

Determining whether plaintiff's constitutional rights have been violated requires a "fact-intensive inquiry under constitutional standards." *Gillis*, 468 F.3d at 492 (citation omitted). "This is due not only to the need to measure the particular conditions of confinement against the Eighth Amendment's requirements, but also the requirement that those conditions must be assessed in light of the circumstances." *Bowers v. Pollard*, 602 F. Supp. 2d 977, 987 (E.D. Wis. 2009), aff'd, 345 Fed. Appx. 191 (7th Cir. 2009) (unpublished). "[W]hat may appear cruel and unusual in one context may not be so in another." *Id.*

Defendants argue that they are entitled to summary judgment on plaintiff's Eighth Amendment conditions of confinement claims because the conditions of confinement were not individually or collectively sufficiently serious to deny plaintiff any of life's necessities and also because they were not deliberately indifferent to any serious harm. Defendants also submit that they are entitled to qualified immunity, that defendants Huibregtse and Schwandt were not personally involved in any constitutional deprivation, and that plaintiff cannot recover damages for emotional distress because he presents no evidence of a physical injury.

Plaintiff maintains that WSPF staff routinely placed him in clinical observation as a punitive measure to address his disruptive behavior. He argues that these repeated trips were a form of punishment and had a significant impact on his already fragile mental state.

Defendants isolate each specific allegation or incident underlying plaintiff's claims and argue the justification for those deprivations. Plaintiff, on the other hand, encourages

the court to look at the overall picture and to consider whether the totality of the conditions plaintiff endured while at WSPF constitutes cruel and unusual punishment.

A.  Clothing

    1.  Hall

Plaintiff was allowed to proceed on claims that on various occasions he was forced to walk naked down the hall in the segregation unit in front of male and female staff, as well as other inmates.  On August 10, 2010, a WSPF cell extraction team escorted plaintiff down the hallway completely naked for approximately seventeen seconds.  On September 16, 2010, the walk lasted eighteen seconds, and the video reveals that plaintiff was wearing a segregation smock and a spit mask.  It is possible that there was another, subsequent cell transfer that day that was not on video.

On October 6, 2010, plaintiff was escorted naked for a twenty second walk from one cell to another after a cell extraction.  According to Lieutenant Brudos, "[i]t was just a short distance and we did not have time to give him a towel because he continued to argue and resist the officers."  Plaintiff was not naked on the two walks he complained about on September 22.  He had clothes on for the first one, and a towel for a second one.

Captain Lebbeus Brown testified at his deposition that there should not be an instance in which an inmate is moved from cell to cell without being clothed.  Movement of an inmate without any clothing is not a necessary control technique.  However, this testimony does not establish a constitutional violation.  While it was not best practice to escort plaintiff naked through the hallway, there is no indication that these brief walks without clothing were "maliciously motivated," *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004), or "conducted in a harassing manner intended to humiliate and inflict psychological

pain." *Calhoun v. Detella*, 319 F.3d 936, 939 (7th Cir. 2003). The court has relied on the legal standard regarding strip searches because it seems most analogous to these walks, which occurred in the course of getting plaintiff from one cell to another as quickly and efficiently as possible during confrontations with prison staff or following cell extractions.

2. Cell

The heart of this case is plaintiff's claim regarding the time he spent naked or in a segregation smock. There is some dispute regarding the total number of days at issue, but it is not material. It is undisputed that on at least ten occasions plaintiff was naked either en route to or in a clinical observation cell. These periods without clothing ranged from three to 48 hours, with one instance where plaintiff was naked during clinical observation for five days. Each decision to place plaintiff naked in clinical observation (or to continue his placement) was made by a mental health professional. Every decision was made after plaintiff threatened or attempted self-harm. Four of these initial placement decisions were made by Dr. Becker-Lindow, who is not a party to this action. The remaining initial placement decisions were made by Shannon-Sharpe or Dr. Hoem.

"Forced nudity can degrade and humiliate a prisoner." *Bowers*, 602 F. Supp. 2d at 992. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). "[T]he Eighth Amendment protects more than an inmate's physical health and safety. It also protects his dignity as a human being, even when, as in this case, the inmate engages in conduct that makes such dignity difficult to recognize." *Bowers,* 602 F. Supp. 2d at 991.

In *Bowers*, the prison was dealing with a manipulative inmate who acted out regularly and harmed himself often by inserting items into his penis. This led the district court to conclude that "when a prison is facing a recalcitrant and uncontrollable inmate, it has a freer hand to take steps to impose discipline and ensure the inmate's own safety without running afoul of the Eighth Amendment." *Id*. at 989. Finally, the prisoner was placed in restraints for as long as twelve hours any time he threatened to harm himself. However, he was left naked, even when he was in five-point restraints, and was not released when he needed to use the toilet. *Id*. at 991. The defendants in *Bowers* offered no explanation for why the prisoner was kept naked while restrained or why he was left to urinate or defecate on himself. *Id*. at 992. For these reasons, the court was unable to say that the conditions the prisoner endured did not fall within the meaning of cruel and unusual punishment proscribed by the Eighth Amendment. *Id*. Nevertheless, the court found no evidence that the defendants acted with the intent to cause wanton harm or humiliation to Bowers; the undisputed evidence demonstrated that the defendants acted with the intent to protect Bowers' physical safety and well-being, as well as to preserve and maintain internal order, discipline, and security. *Id*. at 992-93. Although the conditions deprived the prisoner of some dignity, they "were imposed not to cause unnecessary harm to the plaintiff but to prevent the self-abusive behavior and protect him from himself." *Id*. at 993.

> In essence, the defendants faced a dilemma with no easy options. It was as if for some nine months they were facing a hostage crisis in which the same person occupied the position of both victim and perpetrator. Bowers insisted that the prison staff accede to his demands—a transfer, a change of cells, a longer period for writing, the return of property, etc.—or he would harm himself. Obviously, prison officials cannot negotiate with an inmate concerning such matters and allow him that kind of power and control. Yet, the prison staff was unable to rescue the hostage. Because the threatened

hostage was the same person as the threatening perpetrator, they could not be separated. It was impossible to deny the perpetrator access to his hostage. The defendants were left with the almost impossible task of trying to protect a man from himself twenty-four hours a day and seven days a week. Their efforts to do so, even if at times mistaken and perhaps even counterproductive, reflect not indifference but tremendous concern for Bowers' care and safety, far more than he had for himself. It is difficult to imagine any institution on earth, penal or not, that could or would be expected to expend as much time, effort and resources to protect a person from himself. Indeed, it is the prison staff's very concern for Bowers' physical safety that, in his mind, gave him so much power over them.

*Id.*

This case is not entirely analogous to *Bowers*. Plaintiff, thankfully, was not as serious about harming himself as Bowers, which also means that plaintiff's conditions in clinical observation were not as restrictive as those Bowers endured. Plaintiff was not placed in restraints, and he was able to use the toilet.

Plaintiff continued to make threats of self-harm because he knew that PSU staff, including Shannon-Sharpe and Dr. Hoem, would take his threats seriously. Even when he was being manipulative and seemed to be insincere in his threats, PSU staff believed that they must take plaintiff's threats seriously because they could not predict when he might follow through with his threats of self-harm or unintentionally harm himself.

Thus, even if the time plaintiff spent naked or in a segregation smock in clinical observation deprived plaintiff of dignity and denied him one of life's necessities, defendants have shown evidence that they did not act with a culpable state of mind. Had Shannon-Sharpe or Dr. Hoem left plaintiff in his cell or with clothing that could be used to harm himself after he made a threat of self-harm, then they might be responsible for disregarding that risk by failing to take reasonable measures to abate it. *See Farmer*, 511 U.S. at 847. Each decision Shannon-Sharpe and Dr. Hoem made was based on the relevant factors for

placement or continuation in clinical observation status. These decisions were based on their professional judgment.

Plaintiff argues that there was no reason that he should not have had at least a segregation smock. He relies exclusively on testimony that it is impossible to make a noose out of a segregation smock. However, there are other ways an inmate could use a segregation smock to hurt himself.

Ultimately, plaintiff argues that because he was left in a cell completely naked for days at a time he was subject to a risk that was so obvious that a jury could reasonably infer that defendants had actual knowledge of a serious harm that could result. Huibregtse testified that leaving a prisoner in controlled segregation or observation for approximately 44 days was significant, though that number of days is in dispute. Huibregtse also testified that plaintiff garnered regular discussions between security and psychological services staff; he was mentioned frequently at meetings.

Over time, plaintiff's behavior escalated and he threatened self-harm more often. On more than one occasion, plaintiff was released from clinical observation and returned with threats of self-harm later that day.

Unlike the prisoners in *Gillis* or *Townsend*, or even *Bowers*, who were on official behavior programs, plaintiff's clothing was returned after he calmed down. The record reflects plaintiff's hope to get out of Alpha Unit, but there is no evidence that he was subject to a formal behavioral plan.

When plaintiff was in clinical observation, he was assessed at least once each day and held the keys to the return of his clothes and his release from clinical observation. *See Gillis*, 486 F.3d at 494 (citing *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005)

(prisoner cannot be permitted to engineer an Eighth Amendment violation)). In *Rodriguez*, the Seventh Circuit said, "[w]e think that deliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment. Rodriguez punished himself." *Rodriguez*, 403 F.3d at 952-53. In this case, plaintiff was punishing himself by making threats of self-harm that he knew PSU had to take seriously.

To the extent plaintiff was arguing a policy claim against WSPF or any of the defendants in their official capacity, that is not a claim that was pled or on which plaintiff was allowed to proceed. Simply naming a defendant in his or her official capacity does not create a policy claim. Plaintiff's allegations related to defendants' actions towards him; they did not suggest that WSPF maintained a policy that resulted in a constitutional deprivation. In any event, the Eleventh Amendment bars claims for money damages against officers of a state sued in their official capacities, *Omosegbon v. Wells*, 335 F.3d 668, 672-73 (7th Cir. 2003), and any claims for injunctive relief became moot when plaintiff was released from prison. *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004).

Defendants are entitled to summary judgment on claims regarding plaintiff's conditions of confinement in clinical observation.

B. Bedding

Defendants relied on their discussion of Shannon-Sharpe and Hoem's decisions regarding clothing to address concerns about bedding, and plaintiff did the same. There is no need to address these claims separately.

However, the court must separately address plaintiff's bedding claims against Lt. William Brown and Warden Huibregtse. The warden avers that at no time was he aware that plaintiff was denied bedding; that is not the type of situation that would be brought to

his attention as those decisions were made by security, HSU or PSU staff. Plaintiff offered no contradicting evidence. The warden was not personally involved in any decisions regarding the bedding plaintiff received, and he is entitled to summary judgment on this claim. *See Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009).

With regard to Lt. Brown, defendants submit that plaintiff's bedding allegations against Lt. William Brown are so vague he cannot respond specifically to them. However, plaintiff has narrowed his claim down to two weeks out of a two-month period and believes that prison forms or video footage could identify when he was without bedding. Lt. Brown does not deny that he took plaintiff's bedding and, in fact, believes that he probably did place plaintiff on such a restriction. However, defendants insist they are unable even to respond to plaintiff's claim. This is to their detriment since they have offered no justification or explanation for why plaintiff was deprived of bedding for two weeks. During that time, plaintiff was cold and had to sleep on a concrete slab. A reasonable jury could conclude that sleeping on cold concrete for two weeks without bedding is a condition of confinement that deprives an inmate of "the minimal civilized measure of life's necessities." *Gillis*, 468 F.3d at 491. The court cannot grant summary judgment in favor of Lt. William Brown.

C. Food

It is undisputed that plaintiff was served Nutraloaf at least three times during his stay at WSPF. Plaintiff also submits that he was denied meals on multiple occasions and that WSPF staff repeatedly spit in his food or handled his food with their bare hands. Defendants argue that Warden Huibregtse, the only defendant named in this claim, was not involved in or aware of what inmates were being fed, which inmates refused food, or when inmates were denied meals based on their behavior or which inmates were denied meals

inappropriately.  Plaintiff seems to concede this as an independent claim, but argues that these food-related conditions of confinement, along with the fact that plaintiff was repeatedly denied adequate clothing and safety, violated plaintiff's Eighth Amendment rights.  Despite this argument, there is no evidence to suggest that Warden Huibregtse knew specific details about the food plaintiff was or was not receiving.  He was not personally involved and is entitled to summary judgment on this claim.  *See Burks*, 555 F.3d at 596.

D.  Leg Restraints

Finally, plaintiff argues that he was denied adequate safety when he was left in his cell wearing leg restraints for approximately three and a half hours on July 19, 2010.  It is undisputed that Officer Belz and Officer Weigel forgot to remove the leg restraints when they returned plaintiff to his cell on the morning of July 19.  Plaintiff complained, and the officers received letters of reprimand from Warden Huibregtse.  Without more respecting the actions of Officers Belz and Weigel, this negligence is not actionable under 42 U.S.C. § 1983.  *Thomas v. Farley*, 31 F.3d 557, 558 (7th Cir. 1994).

There is a dispute of fact regarding whether plaintiff notified Sergeant Carpenter via intercom that the leg restraints were still on.  Plaintiff avers that he notified Sergeant Carpenter, who failed to take action to have the leg restraints removed.  This dispute is not material, though, because on this occasion plaintiff had leg restraints on for only three and a half hours, during which he could move around his cell.  Consequently, this limited deprivation of full movement did not deny him "the minimal civilized measure of life's necessities."  *Gillis*, 468 F.3d at 491.

Warden Huibregtse was made aware of the incident regarding plaintiff's leg restraints after the fact. When he learned what happened, he wrote letters of reprimand to Officers Belz and Weigel. He was not otherwise involved in the matter. *See Burks*, 555 F.3d at 596.

Based on the resolution of the claims above, there is no need to consider defendants' arguments regarding qualified immunity and damages. Therefore,

IT IS ORDERED that the defendants' motion for summary judgment (Doc. 80) is GRANTED in part and DENIED in part respecting Lt. William Brown.

IT IS FURTHER ORDERED that plaintiff's claims against the following defendants are DISMISSED: Joni Shannon-Sharpe, Dr. Stacey Hoem, Peter A. Huibregtse, Security Director L.J. Schwandt, Capt. Larry Primmer, Lt. Todd Brudos, Thomas Belz, Ofc. Keith Weigel, Sgt. Mark Carpenter, and Captain Lebbeus Brown.

Dated at Milwaukee, Wisconsin, this 31st day March, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. District Judge